```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____               │
│ DATE FILED:___03/03/2023___          │
└─────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Kelly Leto,

                            Plaintiff,

            -against-

Commissioner of Social Security,

                            Defendant.

---

22-cv-00863 (SDA)

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Kelly Leto ("Leto" or "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") that denied her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Compl., ECF No. 1.) Presently before the Court are the parties' cross-motions, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings. (Pl.'s Mot., ECF No. 23; Comm'r Mot., ECF No. 30.)

For the reasons set forth below, Plaintiff's motion is granted, the Commissioner's motion is denied and this action is remanded for further proceedings.

**BACKGROUND**

**I.      Procedural Background**

On June 30, 2020, Leto filed applications for DIB and SSI, with an alleged disability onset date of May 31, 2020. (Administrative R., ECF No. 14 ("R."), 149.) The Social Security Administration ("SSA") denied her applications initially on December 2, 2020 and upon reconsideration on May 12, 2021. (R. 152, 168, 182.) Thereafter, Leto filed a written request for

a hearing before an Administrative Law Judge ("ALJ"). (R. 196-97.) On September 27, 2021, Leto appeared for a telephonic hearing before ALJ Kieran McCormack. (R. 34-69.) Leto was represented at the hearing by attorney David Levine. (R. 34, 37.)

In a decision dated October 13, 2021, ALJ McCormack found Leto not disabled. (R. 10-21.) On October 20, 2021, Leto requested review of the ALJ decision from the Appeals Council. (R. 267-68.) Her request was denied on January 5, 2022, making ALJ McCormack's decision the Commissioner's final decision. (R. 1-6.) This action followed.

## II.    Non-Medical Evidence

Born on March 26, 1985, Leto was 35 years old on the alleged onset date. (*See* R. 149.) Leto has a high school education and past relevant work as a Walgreens store manager and call center representative. (R. 20, 150.)

## III.    Medical Evidence Before the ALJ

### A.    Treatment Records Prior To Alleged Onset Date

Leto first saw psychiatrist Dr. Renata Krymkevich on June 3, 2016 for a psychiatric evaluation and medication management following a referral from her therapist, Susan McVey.[1] (R. 600.) Leto reported feeling anxious, angry and depressed and that it was hard for her to go out in public. (*Id*.) Leto also described low energy levels, and difficulty sleeping. (*Id*.) Dr. Krymkevich noted that Leto had re-entered therapy approximately one month earlier and was prescribed different anti-depressants by her primary care provider. (R. 599-600.) Leto had been

---

[1] McVey is a Licensed Clinical Social Worker ("LCSW") with Dr. Michele Winchester-Vega and Associates. (*See* R. 667.) As discussed herein, the record contains treatment notes from LCSW McVey for the periods June through August 2020 and April through September 2021. (R. 657-81.) However, given Dr. Krymkevich's note, Leto appears to have seen LCSW McVey off and on during earlier periods as well.

on Xanax for approximately two-and-a-half years, but wanted to stop taking it due to the risk of addiction. (R. 599.) Although taking Xanax helped her go out and socialize, she still had depression and anger. (*Id*.) At the time, Leto was working as a manager at Rite Aid and reported spending her free time hanging out with her son and going to the movies and out to eat. (R. 598.)

On mental status examination, Leto reported increased feelings of anxiety, apathy, low energy levels, sleep interruptions and difficulty focusing and concentrating. (R. 598.) Dr. Krymkevich noted that Leto's thought processes were coherent and goal-oriented without delusional content; she was alert and oriented and had "some insight about her issues" and her behavioral control was adequate. (R. 597-98.) Leto also completed a PHQ-9 questionnaire, resulting in a score of 21. (R. 607.) Dr. Krymkevich diagnosed major depressive disorder, generalized anxiety disorder and panic disorder. (R. 597.) She recommended that Leto continue therapy with her current provider and prescribed medications. (*Id*.)

Leto continued to see Dr. Krymkevich approximately once per month through the alleged onset date. (R. 567-607.) During this period, Leto reported frequent fluctuations in her mood, anxiety and stress levels. (*Id*.) For example, in July 2016, Leto reported feeling better with an improved mood, but the following month, she reported feeling anxious on a daily basis with breakthrough panic attacks two to three time a day. (R. 596.) Approximately six weeks later, on September 29, 2016, Dr. Krymkevich noted that Leto seemed less anxious, with a brighter affect and verbalized good insight about her situation and herself, but still described social anxiety and reported that her job was "anxiety provoking[,]" "like having knots in [her] stomach" and that she felt very uncomfortable in grocery stores and other places. (R. 593, 595.) During her next appointment, on November 1, 2016, Leto reported feeling "not bad[,]" but in December reported

feeling "all over the place" and having a high level of anxiety, particularly in public places. (R. 592-93.) Leto continued to experience similar ups and downs over the next several years. During this period, Dr. Krymkevich frequently adjusted Leto's medications and she generally was compliant with her medications with no reported side effects. (*See, e.g.*, R. 575-76, 578, 586, 589-91, 597, 602, 603, 605-06.)

In August 2019, Dr. Krymkevich recommended that Leto take medical leave from her job at Walgreens/Rite Aid. (R. 573.) Leto continued reporting having good days and bad days. (*See* R. 603-06.) In February 2020, Leto started a new job as a patient care coordinator. (R. 602.) The following month, Leto reported feeling slightly more anxious due to the nature of her job as a customer service representative, but denied panic attacks and Dr. Krymkevich noted a brighter affect. (*Id*.) During her next visit on April 20, 2020, Leto reported doing "not bad" and denied acute depressive symptoms or panic attacks. (*Id*.) Dr. Krymkevich noted that Leto remained gainfully employed and appeared "rather adjusted to it." (*Id*.) On May 19, 2020, shortly before the alleged onset date, Leto reported feeling "so-so" with a high level of anxiety. (R. 601.) Leto admitted feeling tired and aggravated due to work-related stress and feeling that her co-workers were being given preferential treatment, but denied acute depressive symptoms. (*Id*.)

**B.    May 31, 2020 Through July 2020 Treatment Records**

On May 31, 2020, Leto called Dr. Krymkevich and indicated that she was not "doing well at all" and felt sad with daily crying spells and active suicidal ideation with plans to overdose on pills or drive off a cliff. (R. 601.) Dr. Krymkevich strongly advised Leto to go to the hospital for an emergency psychiatric evaluation. (*Id*.) The same day, Leto presented to the emergency department at Garnet Health Medical Center following worsening depression and suicidal

ideation. (*See* R. 412, 415, 417.) Following a psychiatric evaluation, Leto was admitted to the Behavioral Health Unit at Catskills Regional Medical Center. (R. 442, 457-58.) On June 2, 2020, Dr. Krymkevich had a phone conversation with Leto's treatment coordinator regarding medication management. (R. 601.) Leto was discharged on June 5, 2020, with follow-up appointments scheduled with LCSW McVey and Dr. Krymkevich.  (R. 510.)

On June 8, 2020, Leto completed a PHQ-9 questionnaire with a score of 22. (R. 679; *see also* R. 706.) A June 10, 2020 note from LCSW McVey indicated that Leto was returning to treatment. (R. 667; *see also* R. 699.) LCSW McVey noted that Leto had checked herself into the hospital after decompensating, but denied any suicidal ideation at the time, although she felt depressed. (*Id*.) Leto saw Dr. Krymkevich again for a follow-up appointment on June 12, 2020. (R. 594.) Leto discussed her recent hospitalization and reported that the treatment helped her feel better. (*Id*.) Leto denied acute depressive symptoms, but did report feeling down. (*Id*.) Dr. Krymkevich noted that Leto started therapy and that Leto's treatment had changed and she was taking Effexor XR, Buspar and Vistaril. (*Id*.) Leto agreed to increase her doses of Buspar and Effexor and Dr. Krymkevich planned to re-evaluate her progress in ten days. (*Id*.)

On June 15, 2020, Leto saw LCSW McVey for a therapy session. (R. 665; *see also* R. 696.) LCSW McVey noted her mood as depressed. (R. 665.) Leto reported that she was considering going back to school for medical coding/billing and shared her frustration of social anxiety. (*Id*.) Leto set a goal of going out to do daily tasks such as getting gas or grocery shopping. (*Id*.) During her next appointment with Dr. Krymkevich on June 22, 2020, Leto described a high level of anxiety, but denied any changes in her emotional state since her las appointment. (R. 594.) Leto reported social withdrawal and that she was afraid to go out and had minimal interaction with

anyone other than her son. (*Id*.) She was continuing therapy to improve her socialization and had been compliant with her medications with no side effects reported. (*Id*.) Dr. Krymkevich increased Leto's dose of Effexor with a plan to reevaluate her progress in ten days. (*Id*.) On June 24, 2020, LCSW McVey noted that Leto's mood was anxious and she was working on emotionally focused therapy and progressive relaxation techniques. (R. 665; *see also* R. 696.)

During her next appointment with LCSW McVey, on July 6, 2020, Leto reported ongoing mood fluctuations and increased suicidal ideation and LCSW McVey discussed a safety plan. (R. 666; *see also* R. 697.) On July 8, 2020, Leto reported to Dr. Krymkevich feeling down with crying spells and passive suicidal ideation. (R. 583.) She discussed trying to force herself to get out of the house to be around people and that she felt her current medications were not working. (*Id*.) She agreed to try Cymbalta and an anti-depressant/anti-anxiety medication. (*Id*.) Dr. Krymkevich decreased her dose of Effexor and prescribed Cymbalta with a plan to re-evaluate her progress in another ten days. (*Id*.)

On July 20, 2020, Leto reported feeling slightly better and denied acute depressive symptoms or suicidal ideation. (R. 583.) Leto reported that she was able to tolerate Cymbalta without side effects and was spending time with her family and taking daily walks. (*Id*.) She was compliant with her medications and continued to participate in individual therapy on a weekly basis. (*Id*.) Dr. Krymkevich continued Leto on the same course of treatment with another follow-up in two weeks. (*Id*.)

### C.    July 20, 2020 Dr. Krymkevich Medical Source Statement

Also on July 20, 2020, Dr. Krymkevich completed a psychiatric assessment form for Leto.[2]

(R. 563-66.) Dr. Krymkevich noted Leto's diagnoses as major depressive disorder, generalized

anxiety disorder and panic disorder. (R. 563.) Dr. Krymkevich noted Leto's current symptoms as

lowered mood, anxious affect, sleep and appetite disturbances, impaired activities of daily living,

and fleeting suicidal ideations and indicated that Leto had "chronic debilitating mental illness"

and "chronic fatigue due to insomnia." (*Id*.) On mental status examination, Dr. Krymkevich noted

that Leto was cooperative and adequately groomed; her speech was soft, and her thought

process was overdetailed; she had lower mood, tearful affect; difficulty staying focused; no

apparent cognitive impairment; adequate fun of knowledge and fair insight and judgment. (R.

564.) Dr. Krymkevich indicated that Leto spent most of her time at home; was withdrawn socially

and spent all her energy attending to her son. (*Id*.) Dr. Krymkevich further indicated that Leto was

not able to function at work due to severe depression and anxiety. (*Id*.) Dr. Krymkevich noted

that Leto had difficulty recalling certain events; was withdrawn socially with anticipatory anxiety

and breakthrough panic attacks; had social anxiety/avoidance and difficulties adjusting to

changes due to anxiety. (R. 565.)

### D.    August 2020 Through September 2020 Treatment Records

During a follow-up visit with Dr. Krymkevich on August 4, 2020, Leto reported feeling

better after taking Cymbalta, with a less pessimistic outlook and slightly brighter affect, but

complained of problems falling asleep.  (R. 572, *see also* R. 646.) Dr. Krymkevich advised her to

take Cymbalta during the day and planned to reevaluate her progress in one month. (R. 572.)

---

[2] The form appears to be missing the first page. (*See* R. 563 (marked page 2 of 8).)

Leto saw LCSW McVey again on August 12, 2020. (R. 666; *see also* R. 697.) Leto reported ongoing suicidal ideation, but to a lesser degree, and increased anxiety. (R. 666.) LCSW McVey discussed "thought stopping" techniques with Leto and explored the concept of wellness. (*Id*.) The same day, Leto completed another PHQ-9 with a score of 23. (R. 677; *see also* R. 705.) During another session with LCSW McVey the following week, on August 19, 2020, Leto reported challenging herself to go to Wal-Mart and, although she was anxious, she finished shopping. (R. 663.) LCSW McVey encouraged Leto to continue working on her wellness map. (*Id*.; *see also* R. 694.)

During a September 10, 2020 session with Dr. Krymkevich, Leto reported feeling the same and that she was feeling tired due to disturbed sleep patterns. (R 572.) Dr. Krymkevich restarted Leto on Halcion as a sleeping aid and planned to arrange a sleep study to rule out sleep apnea. (*Id*.) Dr. Krymkevich noted that Leo remained withdrawn socially and had to force herself to get out of the house. (*Id*.) Dr. Krymkevich planned to follow-up in one month. (*Id*.) The following week, on September 16, 2020, Leto saw LCSW McVey for a therapy session during which she reported feeling a little better and was helping her sister by watching her children. (R. 663; *see also* R. 694.)

E.    **October 2020 Psychiatric Consultative Examination – Dr. Marisol Valencia-Payne, Psy.D.**

On October 8, 2020, Leto saw Dr. Marisol Valencia-Payne over Zoom for a psychiatric consultative examination. (R. 682-87.) Leto reported that she had difficulty falling asleep and had been experiencing episodes of depression since the age of 12, but with recurrent major depression episodes since February 2020. (R. 683.) Leto reported that her symptoms included dysphoric mood, fatigue, loss of energy, guilt, hopelessness, loss of usual interests, worthlessness, diminished sense of pleasure, social withdrawal, concentration difficulties, history of suicidal

ideation and memory loss. (*Id*.) Leto further reported symptoms of anxiety including excessive apprehension and worry, irritability, avoidance of social settings, fear of being judged or negatively evaluated in social settings, restlessness, becoming easily fatigued and difficulty concentrating. (*Id*.)

On mental status examination, Dr. Valencia-Payne noted that Leto appeared to be cooperative with the evaluation and her manner of relating, social skills and overall presentation were adequate. (R. 684.) Leto's thought processes were coherent and goal directed; her affect was dysphoric and her she reported feeling sad, angry and nervous. (R. 685.) Dr. Valencia-Payne found that Leto's attention and concentration and recent and remote memory skills were intact; her intellectual functioning was average; her insight was fair and her judgment was between fair and limited. (*Id*.) Leto reported difficulty with cooking due to concentration and difficulty with shopping, driving and using public transportation due to anxiety and panic attacks when going out in public. (R. 686.) Leto reported socializing mainly with her family and her sister, with whom she had good relationships. (*Id*.)

Dr. Valencia-Payne opined that Leto had moderate limitations in using reason and judgment to make work-related decisions; interacting appropriately with supervisors, coworkers and the public; sustaining concertation and performing a task at a consistent pace; sustaining an ordinary routine and regular attendance at work. (R. 686.) Dr. Valencia-Payne further opined that Leto had moderate to marked limitations in regulating emotions; controlling behavior and maintaining well-being. (*Id*.) Her difficulties were caused by fatigue, lack of motivation, and mental health concerns involving depression and anxiety symptoms. (*Id*.) According to Dr. Valencia-Payne, the results of the examination appeared to be consistent with psychiatric

problems, but did not appear to be significant enough to interfere with Leto's ability to function on a daily basis. (*Id*.)

Dr. Valencia-Payne diagnosed major depressive disorder, recurrent, severe; social anxiety disorder with panic attacks; and Xanax use disorder, severe, in early remission. (R. 686.) She recommended that Leto continue with psychological and psychiatric treatments and recommended vocational assessment, training and rehabilitation. (R. 687.)

**F.**     **October 2020 Psychological Consultant Dr. T. Bruni, PhD**

On October 23, 2020, SSA psychological consultant Dr. T. Bruni completed an evaluation of Leto as part of her initial disability determination. (R. 76-83.) First, Dr. Bruni found that Leto had medically determinable impairments of depressive and anxiety disorders, but that did not meet the criteria for Listing 12.04 or 12.06. (R. 77.) Dr. Bruni opined that Leto had no limitation in her ability to understand, remember or apply information, but moderate limitations in her ability to interact with others; concentrate, persist or maintain pace; and adapt or manage oneself. (*Id*.)

In conducting a mental residual functional capacity ("RFC") assessment, Dr. Bruni found that Leto was moderately limited in her ability to maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation. (R. 79-83.) Dr. Bruni concluded that Leto was able to understand and remember

simple and detailed instructions and work procedures without substantial limitation and that, "[a]lthough [Leto] may have lapses in focus, motivation and reliability, the frequency, intensity and duration of these occurrences would not be expected to substantially detract from [her] ability to complete routine tasks at a reasonable pace." (R. 83.) Moreover, Dr. Bruni opined that although Leto "exhibit[ed] some difficulty with socialization in daily life," she was "able to interact in a socially appropriate manner." Finally, Dr. Bruni opined that Leto "exhibit[ed] some difficulty with adaptation but [was] able to cope with basic changes and make routine decisions." (*Id*.)

G.    **Dr. Krymkevich December 2020 Medical Source Statement**

On December 14, 2020, Dr. Krymkevich completed another Medical Source Statement. (R. 631-34.) Dr. Krymkevich indicated that Leto had been under her care since 2016 and had been diagnosed with major depressive disorder, generalized anxiety disorder and panic disorder. (R. 631.) Dr. Krymkevich identified Leto's signs and symptoms as follows: appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia, feelings of guilt/worthlessness, difficulty thinking or concentrating, decreased energy, and generalized persistent anxiety. (*Id*.) Under clinical findings, Dr. Krymkevich noted lowered mood, anxious affect, frequent panic attacks and social withdrawal. (R. 632.) Dr. Krymkevich opined that Leto was "not able to work at any capacity ats present." (*Id*.) Dr. Krymkevich indicated that Leto's ability to understand, remember and carry out instructions was not affected by her impairments, but also indicated that Leto had a marked loss in her ability to understand and remember detailed instructions; maintain regular attendance and be punctual; deal with stress of semi-skilled or skilled work; work in coordination with or proximity to others without being

unduly distracted; and complete a normal workday or workweek without interruption from psychologically based symptoms. (R. 632-33.)

Dr. Krymkevich also indicated that Leto had a marked loss in her ability to accept instructions and respond appropriately to criticism from supervisors; get along with coworkers and peers without unduly distracting them or exhibiting behavior extremes; and respond appropriately to changes in a work setting. (R. 633.) In terms of functional limitations, Dr. Krymkevich indicated that Leto had no restrictions in activities of daily living; moderate difficulties in maintaining social functioning; often experienced deficiencies of concentration, persistence or pace; and had repeated episodes of deterioration or decompensation in work-settings. (R. 634.) Dr. Krymkevich indicated that Leto's condition had remained "unstable since 2019." (*Id*.)

### H.    February 2021 Psychiatric Consultative Examination – Dr. Todd Deneen, Psy.D.

On February 27, 2021, Leto saw Dr. Todd Deneen for a psychiatric consultative examination. (R. 635-39.) For current functioning, Leto reported waking up at night and experiencing a loss of appetite. (R. 636.) Her depressive symptoms included dysphoric mood and social withdrawal. (*Id*.) Leto reported suicidal ideation two weeks prior to the evaluation but no suicidal thoughts at the time of the evaluation and stated that she wanted to live for her son. (*Id*.) Dr. Deneen noted that Leto had random anxiety and was nervous in social situations and around people. (*Id*.) She reported episodes of panic with palpitations, sweating and breathing difficulties, as well as struggles with concentration. (*Id*.)

Upon mental status examination, Dr. Deneen noted that Leto's demeanor was cooperative and her social skills were adequate. (R. 636.) Her thought processes were coherent

and goal directed; her affect was flat and her reported mood was euthymic. (R. 637.) Dr. Deneen found that Leto's attention and concentration were mildly impaired due to attention deficits. (*Id*.) Leto's recent and remote memory skills were intact; her intellectual functioning was average; her insight was good and her judgment was fair. (*Id*.) With respect to mode of living, Dr. Deneen noted that Leto could dress and shower on a daily basis and do cooking, cleaning and laundry, as needed. (*Id*.) Her mother did her shopping for her due to anxiety. (*Id*.) Dr. Deneen also noted that Leto had a supportive family but did not socialize with others. (*Id*.)

Dr. Deneen opined that Leto had mild limitations in sustaining concentration and performing a task at a consistent pace; moderate limitations in regulating emotions, controlling behavior and maintaining well-being. (R. 638.) These difficulties were causes by Leto's mood symptoms. (*Id*.) Dr. Deneen diagnosed major depressive disorder, recurrent, moderate with anxious distress and panic disorder. (*Id*.) He recommended that Leto continue with psychiatric treatment and stated that she also would benefit from individual psychological therapy. (*Id*.)

I.   **March 2021 Through July 2021 Treatment Records**

Leto next saw Dr. Krymkevich again on March 30, 2021. (R. 645.) Leto reported that she had stopped taking her medications approximately four months ago and had felt "no difference" for three months, but had been getting worse over the past month. (*Id*.) Leto reported feeling down and angry. (*Id*.) Leto had been spending her time taking care of her niece and nephew with minimal social activities and reported feeling very distant from her son. (*Id*.) Leto agreed to start Wellbutrin with a follow-up appointment in three-and-half weeks. (*Id*.)

On April 1, 2021, Leto returned to treatment with LCSW McVey. (R. 662; *see also* R. 693.) Her PHQ-9 score was 27. (R. 673; *see also* R. 703.) She also scored 21 on GAD-7 questionnaire,

indicating severe anxiety. (R. 675; *see also* R. 704.) LCSW McVey noted that Leto presented as tearful and "tired of feeling so bad." (R. 662; *see also* R. 693.) Leto reported that she had terminated her appointments with Dr. Krymkevich due to insurance changes and "shutting down" but had resumed her appointments the day before and had been prescribed Wellbutrin. (*Id*.) LCSW McVey discussed with Leto maintaining healthy appointments, practicing affirmations, journaling and continuing her medications. (*Id*.) The following week, on April 8, 2021, LCSW noted that Leto hadn't seen much improvement on Wellbutrin but had another appoint with Dr. Krymkevich in two weeks. (*Id*.) Leto reported spending a lot of time taking care of her sister's kids and discussed working on advocating for herself. (*Id*.)

On April 15, 2021, LCSW McVey noted Leto's mood as depressed and anxious. (R. 661.) Leto reported having a conversation with her sister about being compensated for the childcare that Leto was providing and discussed struggles with her family. (*Id*.) On April 22, 2021, Leto began a session with Dr. Krymkevich talking about high anxiety levels and difficulty functioning as a result. (R. 650.) Leto agreed to restart Klonopin. (*Id*.) Leto reported spending most of her time taking care of her nephews, 5 days a week, twelve hours per day, and that she was doing it for free. (*Id*.) She had discussed the situation with her therapist and agreed to start looking around for a different job. (*Id*.) Dr. Krymkevich noted that Leto remained compliant with her medications and would follow-up in one month. (*Id*.)

J.      **May 2021 Psychological Consultant Dr. J Ochoa, PsyD.**

On May 4, 2021, SSA psychological consultant Dr. J. Ochoa completed an evaluation of Leto as part of her request for reconsideration. (R. 114-15, 117-22.) Dr. Ochoa opined that Leto had mild limitations in her ability to understand, remember or apply information and moderate

limitations in her ability to interact with others; concentrate, persist or maintain pace; and adapt or manage oneself. (R. 114-15.)

In his mental residual functional capacity assessment, Dr. Ochoa found that Leto was moderately limited in her ability to: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (R. 119-21.)

Dr. Ochoa indicated that he reviewed Leto's Dr. Krymkevich's treatment notes from 2016 through September 2020 and March 2021, as well as Dr. Krymkevich's December 2020 Medical Source Statement. (R. 122.) Dr. Ochoa also discussed Dr. Deneen's February 2021 consultative examination, noting that the mental status examination was "remarkable for flat affect and mildly impaired attention and concentration." (*Id*.) Dr. Ochoa concluded that Dr. Krymkevich did not provide evidence to support the marked limitations in her opinion and that her opinion was not consistent with Leto's longitudinal work history, activities of daily living; recent mental status examination findings, Leto's report to Dr. Deneen and recent treatment notes by Dr. Krymkevich. (R. 122; *see also* R. 642) However, Dr. Ochoa opined that Leto "would benefit from a work environment with limited contact with the public and coworkers." (*Id*.)

**K.**   **May 2021 Through July 2021 Treatment Records**

Leto next saw LCSW McVey on May 6, 2021. (R. 661.) Leto reported that her sister was unable to pay Leto for watching her sister's children, and Leto reported feeling bad. (*Id*.) LCSW McVey noted Leto's mood as depressed. (*Id*.) Leto also reported that she went to an interview for a dental hygienist job, but walked out due to high anxiety and that she felt unready for that step. (*Id*.) LCSW McVey explored what Leto would need to be ready, including less emotional volatility and more comfort around people. (*Id*.)

During her next appointment with Dr. Krymkevich on May 19, 2021, Leto described intermittent bouts of anxiety and that 1 tab of Ativan did not work so she had to take two to three and then felt anxious. (R. 651.) Leto reported that she was able to work things out with her sister so she worked only two days per week. (*Id*.) She also discussed concerns about her son and trying to take care of herself. (*Id*.) Dr. Krymkevich continued her current treatment with a plan to follow-up in one month. (*Id*.) Leto saw LCSW McVey the following day, on May 20, 2021. (R. 660; *see also* R. 691.) LCSW McVey noted Leto's mood as depressed. (*Id*.) Leto reported going to lunch with family and that she had an "ok time" but felt anxious and unable to relax. (*Id*.) LCSW McVey discussed using skills to manage anxiety in social situations. (*Id*.) Leto also shared the role her ex-husband, who was abusive, played in her social anxiety. (*Id*.) LCSW McVey noted that Leto met the criteria for post-traumatic stress disorder ("PTSD") and would begin trauma work in her next session. (*Id*.)

Leto saw LCSW McVey again on May 27, 2021. (R. 660; *see also* R.691.) LCSW McVey again noted Leto's mood as depressed. (*Id*.)  Leto reported difficulty sleeping and LCSW discussed sleep strategies with her. (*Id*.) At her next appointment, on June 10, 2021, LCSW McVey noted Leto's

mood as depressed and anxious. (R. 659; *see also* R. 690.) Leto completed another PHQ-9 questionnaire with a score of 25, which LCSW McVey noted was down two points from April. (R. 669; *see also* R. 701.) In addition, she again scored a 21 on a GAD-7 questionnaire. (R. 671; *see also* R. 702.)

On June 17, 2021, during a visit with Dr. Krymkevich, Leto reported feeling aggravated and irritable most of the time and not comfortable around people. (R. 651) She also reported that she was working with a therapist, who classified her symptoms as PTSD. (*Id*.) Dr. Krymkevich advised her to focus on coping skills and to try Topamax as a mood stabilizer. (*Id*.) Dr. Krymkevich noted that she would re-evaluate Leto's progress in three-and-a-half weeks. (*Id*.) During an appointment with Leto on June 24, 2021, LCSW McVey noted Leto's mood as depressed and anxious and discussed relaxation skills and exposure therapy. (R. 659; *see also* R. 690.)

On July 13, 2021, Leto reported to Dr. Krymkevich that she was feeling slightly better and less irritable. (R. 708.) Dr. Krymkevich noted that Leto remained depressed with social anxiety and decreased energy. (*Id*.) Dr. Krymkevich increased Leto's dose of Topamax but otherwise continued the same course of treatment. (*Id*.)

LCSW McVey saw Leto again on July 22, 2021 and recorded her mood as depressed and anxious. (R. 657; *see also* R. 689.) Leto discussed going to a park with her sister ad nephew and experiencing a lot of anxiety which caused her to leave after an hour-and-a-half. (*Id*.) LCSW McVey discussed relaxation strategies for managing anxiety and Leto reported a slight decreased in depression, attributing it to exercise. (*Id.*) One week later, on July 29, 2021, LCSW McVey again noted Leto's mood as depressed and anxious. (R. 689.) Leto reported feeling better able to manage anger due to her medication. LCSW McVey explored with Leto ways to manage worry.

(*Id*.) Leto reported trouble focusing and sustaining attention and LCSW McVey recommended she practice mindfulness. (*Id*.)

**L.      Dr. Krymkevich July 2021 Medical Source Statement**

On July 13, 2021, Dr. Krymkevich completed another Medical Source Statement for Leto. (R. 653-56.) Her assessment of Leto remained largely the same from the prior report in December 2020, except that Dr. Krymkevich opined that Leto had extreme or complete loss of her ability to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers and peers without unduly distracting them or exhibiting extreme behaviors, whereas in December 2020 she had found Leto to have a marked loss in these areas. (R. 655.) Dr. Krymkevich also found that Leto had a slight restriction of activities of daily living, as opposed to no restriction. (R. 656.) As before, she opined Leto's condition had remained unstable since 2019 and that she was not able to function in a work setting in any capacity. (R. 654, 656.).

**M.      August Through September 2021 Treatment Records**

Leto saw Dr. Krymkevich for a follow-up appointment on August 16, 2021. (R. 708.) Leto reported feeling "not bad" and denied acute depressive symptoms. (*Id*.) Leto indicated that she was not irritable and less angry after increasing her Topamax dose. (*Id*.) Leto reported spending most of her time with her family and taking care of her son. (*Id*.) Dr. Krymkevich noted that Leto remained compliant with her medications with no reported side effects and continued all current treatment. (*Id*.)

During her next appointment with LCSW McVey on August 19, 2021, Leto presented as tearful and LCSW McVey noted her mood as depressed. (R. 688.) Leto reported feeling sad, depressed and isolating people. (*Id*.) LCSW reviewed stress reducing strategies with Leto and

worked on breathing techniques and self-care techniques. (*Id*.) The following week, Leto reported ongoing symptoms of anxiety and depression, but that the breathing techniques had heled to reduce anxiety. (*Id*.) LCSW McVey again noted Leto's mood as depressed and anxious and encouraged Leto to continue mental health self-care. (*Id*.)

On September 15, 2021, Leto saw Dr. Krymkevich and reported feeling "not great," sadder and down, with passive suicidal ideation and social withdrawal. (R. 708.) Leto admitted that her relationships were better and she tried to keep herself occupied and get out of the house at least once per day. (*Id*.) Leto agreed to try Lexapro and Dr. Krymkevich planned to follow-up in three weeks. (*Id*.)

## IV.    The September 27, 2021 Administrative Hearing

### A.    Plaintiff's Testimony

Leto, along with counsel, appeared for an administrative hearing via telephone on September 27, 201. (R. 34-69.) Leto testified that she had been dealing with depression for as long as she could remember, but in the past year everything "just, kind of, came to a head." (R. 49.) She testified that she left her job at the pharmacy because she started having panic attacks and was forgetting things and that the customer service job at Crystal Run was "overwhelming." (R. 50.) Leto testified that she experienced short and long-term memory problems and relied on her parents to schedule her bill payments. (R. 50-51.) When asked about relating to other people, Leto testified that she did not socialize at all and that being around people gave her "very high anxiety." (R. 51; *see also* R. 52 ("I have a fear of being out around people").) In a typical day, Leto testified that she helped her son get ready for school and then would sleep or sit in her room and sometimes write in her journal or listen to music. (R. 55-57.) She would have dinner with her

family, but her parents did the cooking. (R. 56.) Leto testified that she could prepare light meals and do basic cleaning such as vacuuming and dusting. (*Id*.) In response to questions from her attorney, Leto testified that she did not go to stores and that prior to being admitted to the hospital she was having problems with her job at Crystal Run because she wasn't focusing and had trouble grasping what was going on. (R. 57-58.)

**B.   Vocational Expert Testimony**

Vocational expert ("VE") Mary Anderson also testified at the hearing. (R. 59-66.) The ALJ asked the VE whether there would be jobs in the national economist for a hypothetical person who could perform the full range of work at all exertional levels, but was limited to low stress jobs defined as jobs containing no more than simple routine, and repetitive tasks involving only simple work-related decisions with few, if any, workplace changes and where there is only occasional interaction with supervisors, coworkers and/or the general public. (R. 59-60.) The VE testified that such person would be able to perform the work of washer of lab equipment, officer helper or trimmer, press clippings. (R. 61.) The ALJ then asked whether there would be jobs in the national economy for a second hypothetical person who could perform the full range of work at all exertional levels, but was limited to low stress jobs defined as jobs containing no more than simple routine, and repetitive tasks involving only simple work-related decisions with few, if any, workplace changes and where supervision was needed to sustain an ordinary routine and where there was only occasional interaction with the general public and no interaction with supervisors or coworkers. (R. 61.) The VE testified that there would be no jobs in significant numbers in the national economy. (R. 62.)

In response to questions from Leto's attorney, the VE testified that if the second hypothetical person would need more than occasional supervision that would eliminate all jobs (even without the limitation that the person could have no interaction with supervisors and coworkers) and vice versa. (R. 63-64.) The VE further testified that the off-task allowance would be no more than ten percent of the workday and the tolerance for unscheduled absences would be no more than one per month. (R. 64.) Similarly, the VE testified that if a person was 30 minutes late, that would be tolerated approximately once per month. (R. 65.)

## V.      ALJ McCormack's Decision And Appeals Council Review

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards Section II, the ALJ found at step one that Leto had not engaged in substantial gainful activity since May 31, 2020, the alleged onset date. (R. 13.) At step two, the ALJ determined that Leto had the following severe impairments: major depressive disorder, social anxiety disorder, panic disorder, generalized anxiety disorder, PTSD and bipolar disorder.[3] (*Id*.)

At step three, the ALJ found that Leto did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13.) The ALJ specifically considered Listings 12.04, 12.06 and 12.15. (*Id.*) The ALJ discussed the "paragraph B" criteria[4] and found that Leto had a mild limitation in understanding, remembering or applying information and moderate limitations

---

[3] The Court notes that the only treatment records regarding bipolar disorder appear to pertain to another person and appear to have been inadvertently included in the Administrative Record. (*See* R. 647-48.)

[4] The paragraph B criteria "represent the areas of mental functioning a person uses in a work setting." 20 C.F.R. § 404, Subpt. P, App'x 1. They are: "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." *Id*. To satisfy the paragraph B criteria, a claimant's mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. *Id*.

in interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself. (R. 14.) Accordingly, the ALJ found that the paragraph B criteria were not satisfied. (*Id*.) The ALJ also considered whether the "paragraph C"[5] criteria were satisfied, but found that the evidence failed to establish the presence of those criteria because there was no evidence of marginal adjustment and Leto had more than a minimal capacity to adapt to changes in her environment or to demands that were not already part of her daily life. (*Id*.)

The ALJ then assessed Leto's RFC and determined that she was able to perform a full range of work at all exertional levels but was limited to low stress jobs, defined as jobs containing no more than simple, routine and repetitive tasks; involving only simple work-related decisions; with few, if any, workplace changes; and where there was only occasional interaction with supervisors, coworkers and/or the general public. (R. 15.)

At step four, the ALJ found that Leto was unable to perform her past work as a retail store manager. (R. 19.) At step five, the ALJ considered Leto's age, education, work experience and RFC and concluded, based on the VE's testimony, that there were jobs existing in significant numbers in the national economy that Leto could perform, including laboratory aide,[6] office helper and

---

[5] Paragraph C of Listings 12.04, 12.06 and 12.15, among others, provides the criteria used to evaluate "serious and persistent mental disorders." 20 C.F.R. § 404, Subpt. P, App'x 1. To satisfy the paragraph C criteria, there must be "a medically documented history of the existence of the claimant's mental disorder over a period of at least two years, and evidence of both: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder," and "(2) marginal adjustment," *i.e.*, "minimal capacity to adapt to changes in [the claimant's] environment or to demands that are not already part of [the claimant's] daily life." *Id*.

[6] The Court notes that the VE's revised testimony indicated that a hypothetical person with the same RFC would be able to perform the job of lab washer, not laboratory aide. (*See* R. 60-61.)

printer, press clipping. (R. 20.) Therefore, the ALJ found that Leto was not disabled during the relevant period and denied her claim for benefits. (R. 20-21.)

Following the ALJ's decision, Leto sought review from the Appeals Council, which denied her request on January 5, 2022. (R. 1-6.)

## LEGAL STANDARDS

### I. Standard Of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am., Local 537*, 47 F.3d 14, 16 (2d Cir. 1994) (citing Fed. R. Civ. P. 12(c)). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009); *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set aside legally erroneous agency action unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the errors harmless. *Garcia v. Berryhill*, No. 17-CV-10064 (BCM), 2018 WL

5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, "[t]he substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order) (emphasis in original) (citation and internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.   Determination Of Disability

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in

the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (internal citations omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999) (citation omitted). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 50-51.

III.   **Regulations Regarding Consideration Of Medical Opinions And Prior Findings For Applications Filed On Or After March 27, 2017**

Under the regulations applicable to Plaintiff's claim, the ALJ considers five factors in evaluating the persuasiveness of medical opinions: (1) supportability; (2) consistency; (3) relationship of the source with the claimant, including length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship and whether the relationship is an examining relationship; (4) the medical source's specialization; and (5) other factors, including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements." 20 CFR §§ 404.1520c(c), 416.920c(c).

Using these factors, the most important of which are supportability and consistency, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id.* §§ 404.1520c(b), 416.920c(b).

With respect to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 CFR §§ 404.1520c(c)(1), 416.920c(c)(1). As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2). While the ALJ "may, but [is] not required to, explain how [he] considered" the factors of relationship with the claimant, the medical source's specialization, and other factors, the ALJ "*will* explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2) (emphasis added).

An ALJ must provide sufficient explanation to allow a reviewing court to "trace the path of [the] adjudicator's reasoning[.]" *Amber H. v. Saul*, No. 20-CV-00490 (ATB), 2021 WL 2076219, at *6 (N.D.N.Y. May 24, 2021) (quoting *Revisions to Rules Regarding the Evaluation of Medical Evidence* ("*Revisions to Rules*"), 2017 WL 168819 (F.R.), 82 Fed. Reg. 5844-01, at *5858 (Jan. 18, 2017) ("We expect that the articulation requirements in these final rules will allow a . . . reviewing court to trace the path of an adjudicator's reasoning[.]")). An ALJ commits "procedural error by

failing to explain how it considered the supportability and consistency of medical opinions in the record." *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022). However, a court can "affirm if 'a searching review of the record' assures [the court] 'that the substance of the [regulation] was not traversed.'" *Id*. (quoting *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019)).

## DISCUSSION

Plaintiff argues that this action should be remanded for further proceedings because: (1) the ALJ failed to properly consider the opinions of her treating psychiatrist, Dr. Krymkevich; (2) the ALJ failed to consider the amount of Plaintiff's monthly absences; and (3) the ALJ did not properly consider the paragraph B criteria. (Pl.'s Mem., ECF No. 24, at 16-28.) In her cross-motion, the Commissioner argues that the ALJ properly considered the medical opinion evidence, including Dr. Krymkevich's opinions (including regarding absenteeism), and that the ALJ's RFC determination properly accounted for moderate limitations in the paragraph B criteria and is supported by substantial evidence. (Comm'r Mem., ECF No. 31, at 16-24.)

## I.    The ALJ's Evaluation Of The Medical Opinion Evidence

Plaintiff first argues that the ALJ erred in finding the opinions of her treating psychiatrist, Dr. Krymkevich, unpersuasive because they were supported by the medical records, other expert opinions and "even the ALJ's own decision."[7] (Pl.'s Mem. at 17-18.) The Commissioner argues

---

[7] To the extent Plaintiff argues that the ALJ had a duty to further develop the record, the Court disagrees. The record shows that, on March 16, 2021, Dr. Ochoa suggested that reviewing office attempt to obtain additional treatment notes from Dr. Krymkevich, but the following day noted that in February 2021, "the rep submitted all records from [Dr. Krymkevich] [for 2016 through September 2020] and stated that no more evidence is available." (R. 642.) The record also contains Dr. Krymkevich's treatment notes from March 2021 through September 2021, as well as a Medical Source Statement from July 2021. (R. 645, 650-51, 653-56, 708.)

that "the ALJ evaluated the more extreme limitations assessed by Dr. Krymkevich and reasonably found that they were not persuasive as they were unsupported by mental status findings in the doctor's own treatment notes and inconsistent with other evidence in the record." (Comm'r Mem. at 17.)

With respect to supportability, the ALJ found that Dr. Krymkevich's three opinions (July 2020 Medical Source Statement, December 2020 Medical Source Statement and July 2021 Medical Source Statement) were not supported by objective medical evidence because Dr. Krymkevich's treatment records, including Plaintiff's self-reported PHQ-9 questionnaires, "d[id] not contain the results of any mental status examination that could serve to clinically, and objectively, support and corroborate Dr. Krymkevich's opinions" and "for the same reason" her opinions appeared based, in large measure, on Plaintiff's subjective reports. (R. 18-19.) However, Dr. Krymkevich's July 2020 Medical Source Statement did include the results of a mental status examination in which she noted that Leto's speech was soft; her thought process was overdetailed; and she had lowered mood, tearful affect, difficulty staying focused and fair insight and judgment. (R. 564.)

In addition, in the December 2020 and July 2021 Medical Source Statements, Dr. Krymkevich listed clinical findings in support of her opinions, including lowered mood, anxious affect, frequent panic attacks and social withdrawal. (R. 631-32, 653-54.) In addition, at least some of Dr. Krymkevich's treatment notes document the doctor's own observations and findings. (*See, e.g.*, R. 572 (noting social withdrawal), 708 (noting that Leto remained depressed with social anxiety and decreased energy).) It is not clear to the Court that the ALJ considered this objective evidence, which calls into question his determination that Dr. Krymkevich's opinions were not

supported by the record. *See Navedo v. Kijakazi*, No. 20-CV-10013 (JLC), 2022 WL 2912986, at *9 (S.D.N.Y. July 25, 2022) (finding error when unclear whether ALJ overlooked providers' findings in own opinions when assessing supportability); *cf. Credle v. Astrue*, No. 10-CV-05624 (DLI), 2012 WL 4174889, at *22 (E.D.N.Y. Sept. 19, 2012) (omitting notes reflecting components of mental status examination "call[ed] into question the ALJ's determination that the doctor 'did not even administer a mental status examination,' as well as the ALJ's other reasons for discrediting [treating physician's] assessments."); *see also Daniels v. Kijakazi*, No. 21-CV-00712 (GWG), 2022 WL 2919747, at *7 (S.D.N.Y. July 26, 2022) (citing *Brianne S. v. Comm'r of Soc. Sec.*, No. 19-CV-01718 (FPG), 2021 WL 856909, at *5 (W.D.N.Y. Mar. 8, 2021) (remanding where "the ALJ did not examine what [treating doctors] used to support their opinions and reach their ultimate conclusions." (punctuation omitted)).[8]

Moreover, earlier in his decision, the ALJ discussed some of Dr. Krymkevich's treatment records and concluded that they "generally show[ed] the claimant with improvement with medication management, with some lingering limitations consistent with the [RFC]." (R. 16.) Thus, it appears that the ALJ found that Dr. Krymkevich's treatment records supported at least some limitations in her ability to perform work-related functions. However, the ALJ did not identify the "lingering limitations" to which he was referring nor explain how the treatment records

---

[8] The Court also is mindful that "a treating psychiatrist must consider a patient's subjective complaints in order to diagnose a mental disorder" and "consideration of a patient's report of complaints, or history, [a]s an essential diagnostic tool, is a medically acceptable clinical and laboratory diagnostic technique." *Santana v. Astrue*, No. 12-CV-00815 (BMC), 2013 WL 1232461, at *14 (E.D.N.Y. Mar. 26, 2013)(internal quotations and citations omitted); *see also Stasiak v. Berryhill*, No. 17-CV-00437 (JJM), 2018 WL 5993732, at *3 (W.D.N.Y. Nov. 15, 2018) ("In the context of mental health treatment, it is often the case that psychological professionals are required to rely primarily on the statements of patients in forming their diagnoses and opinions; such 'talk therapy' is the underpinning of psychiatric treatment and therapists may rely on subjective complaints elicited from patients during clinical interviews in formulating their medical opinions on functional limitations.").

supported those limitations but not the greater limitations contained in Dr. Krymkevich's opinions. (*Id.*) For these reasons, the Court finds that the ALJ failed to adequately explain his consideration of the supportability factor.

The Court also finds that the ALJ erred in analyzing the consistency factor. The ALJ found that Dr. Krymkevich's opinions were inconsistent with "the preponderance of the other psychiatric clinical evidence of record." (R. 19.) The ALJ then pointed to what he described as "the essentially unremarkable mental status examinations" documented by the consultative examiners, Dr. Valencia-Payne and Dr. Deneen, and clinical notations by LCSW McVey that Leto's "mental health is generally stable[.]" (*Id.*) However, the ALJ's characterization of the mental status examinations as unremarkable glosses over certain abnormal findings, including Dr. Deneen's findings of flat affect, mildly impaired attention and concentration and fair judgment (R. 637), as well as Dr. Valencia-Payne's findings of dysphoric affect and sad, angry and nervous mood.[9] *See Ayala v. Kijakazi*, No. 20-CV-09373 (RWL), 2022 WL 3211463, at *20 (S.D.N.Y. Aug. 9, 2022) (ALJ erred by mischaracterizing evidence in analyzing consistency factor); *see also Navedo*, 2022 WL 2912986, at *12 (ALJ's reliance on "own understanding that [plaintiff's] behavior was 'normal' during mental status examinations" in making RFC determination was "particularly unwarranted" when multiple sources reported abnormal examination results); *Molina v. Saul*, No. 18-CV-04990 (DF), 2019 WL 5287943, at *31-32 (S.D.N.Y. Sept. 28, 2019) (ALJ's characterization of mental status examinations as "largely normal" [is] neither fair nor accurate

---

[9] Indeed, in reviewing Dr. Deneen's evaluation, psychological consultant Dr. Ochoa noted that the mental status examination was "remarkable for flat affect and mildly impaired attention and concentration." (R. 122.)

when downplays other "abnormal" findings including overloud and rapid speech, an anxious mood, and only fair judgment).[10]

Further, the ALJ's reliance on LCSW McVey's notation that Leto's mental health was "stable" was misplaced, since the fact that Leto's condition may have been stable does not mean that her condition had been good, or at a greater functional level than Dr. Krymkevich had opined. *See Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008) (ALJ mischaracterized evidence by interpreting stable to mean good, "when the term could mean only that [plaintiff's] condition ha[d] not changed" and noting that "[plaintiff] could be stable at a low functional level."). Indeed, LCSW McVey's notes contain "Objective Findings" indicating that Leto was anxious and/or depressed.[11] (R. 657, 659-63, 665-66.)

Although, as set forth above, an ALJ's failure to sufficiently explain how he considered the supportability and consistency factors may be harmless error if "a searching review of the record" assures the Court "that the substance of the regulation was not traversed[,]" *Loucks*, 2022 WL 2189293, at *2, the Court finds that these errors were not harmless since a finding of greater limitations could result in a determination that Plaintiff was unable to work. *Accord Bey v. Comm'r of Soc. Sec.*, No. 21-CV-07832 (KHP), 2023 WL 1098183, at *10 (S.D.N.Y. Jan. 30, 2023).

---

[10] The ALJ similarly failed to discuss these findings in evaluating the portion of Dr. Valencia-Payne's opinion finding moderate to marked limitations in Leto's ability to regulate emotions, control behavior and maintain well-being, which he rejected as unsupported by other of her mental status examination findings. (*See* R. 17; *see also* Pl.'s Mem. at 21.)

[11] The Court notes that, although the Commissioner argues that Dr. Krymkevich's assessment was inconsistent with the findings of Drs. Bruni and Ochoa (Comm'r Mem. at 18-19), the ALJ did not discuss their opinions in analyzing Dr. Krymkevich's opinions. (*See* R. 18-19.)

## II.     The Parties' Remaining Arguments

Because I find that the ALJ erred in evaluating the medical opinion evidence, I do not address the parties remaining arguments regarding whether the ALJ's RFC determination is supported by substantial evidence. *Accord Daniels*, 2022 WL 2919747, at *10 (citing *Merriman v. Comm'r of Soc. Sec.*, 2015 WL 5472934, at *24 (S.D.N.Y. Sept. 17, 2015)); *Kathleen K. v. Comm'r of Soc. Sec.*, No. 20-CV-01160 (EAW), 2022 WL 999686, at *7 (W.D.N.Y. Apr. 4, 2022) ("[B]ecause the ALJ failed to properly analyze the persuasiveness of the opinion evidence of record in his decision, and failed to explicitly consider the supportability and consistency factors when evaluating each opinion, the Court's ability to decide whether the ALJ's disability determination was supported by substantial evidence is frustrated.").

### CONCLUSION

For the reasons set forth above, Plaintiff's motion is GRANTED, the Commissioner's motion is DENIED and this action is remanded for further proceedings consistent with this Opinion and Order.

**SO ORDERED.**

Dated:      New York, New York
            March 3, 2023

_____
STEWART D. AARON
United States Magistrate Judge